UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | | |
|---|---|---|
| **AMANDA LYNETTE ORTEGO** | * | **CIVIL ACTION NO. 14-1021** |
| **VERSUS** | * | **JUDGE DOHERTY** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

### REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Amanda Lynette Ortego, born October 25, 1974, filed an application for supplemental security income payments on June 15, 2010, alleging disability since January 1, 2006, because of a lower back injury, manic depression, and a shattered left foot. (Tr. 12, 60).

After denial of the application by an ALJ, the Appeals Council issued a remand order directing the ALJ to further evaluate claimant's mental impairments in accordance with 20 C.F.R. §416.920a; further consider her maximum residual functional capacity ("RFC") with specific restrictions that correlated to claimant's problems with concentration, persistence or pace; obtain, if warranted, evidence from the vocational expert ("VE") to clarify the effect of the assessed limitations on claimant's occupational base; offer claimant an opportunity for a hearing; address the evidence submitted with the request for review; take any further action needed to complete the administrative record, and issue a new decision. (Tr. 8, 84-85).

On remand, the ALJ held a hearing on February 20, 2013. (Tr. 28-58). On March 12, 2013, the ALJ issued a Decision in which he denied the application. (Tr. 8-17).

After denial of claimant's request for review by the Appeals Council, claimant filed an action for judicial review with this court on May 20, 2014.  [rec. doc. 1].

## FINDINGS AND CONCLUSIONS

### Standard of Review

The Court limits its review of a denial of disability insurance benefits to two issues: (1) whether the Secretary applied the proper legal standards, and (2) whether the Secretary's decision is supported by substantial evidence on the record as a whole.  *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Wingo v. Bowen*, 852 F.2d 827, 829 (5th Cir. 1988).

The findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive.  *Richardson v. Perales*, 402 U.S. 389, 390, 91 S.Ct. 1420, 1422, 28 L.Ed.2d 842 (1971).  Substantial evidence is defined as more than a mere scintilla.  *Id*., 402 U.S. at 401, 91 S.Ct. at 1427.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id*.

The Court may not, however, reweigh the evidence or substitute its judgment for that of the administrative fact finder.  *Cook v. Heckler*, 750 F.2d 391, 392-93 (5th Cir. 1985).  If substantial evidence supports the administrative finding, the Court may then only review whether the administrative law judge applied the proper legal standards and conducted the proceedings in conformity with the applicable statutes and regulations.  *Id*.

### Burden of Proof

Disability is defined as " inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A).

The existence of such disability must be demonstrated by medically acceptable clinical and laboratory diagnostic findings, and the overall burden of proof rests upon the claimant. *Cook,* 750 F.2d at 393.

### Analysis

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards. *Anthony*, 954 F.2d at 292.

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:

**(1) Records from Red River Treatment Center dated December 12, 2007 to January 23, 2008**. Claimant was admitted for alcohol dependence, opiate abuse, and depressive disorder, NOS. (Tr. 273). She took medicines to treat her anxiety and panic attacks. (Tr. 291). She had had two DWIs, and had been on probation for two years. (Tr. 288).

Claimant's diagnosis was alcohol dependence, with her last drink on November 27; depressive disorder, NOS, and opiate abuse. (Tr. 288). Her Global Assessment of Functioning ("GAF") score was 65+.

During treatment, claimant made notable progress. (Tr. 297). She was stable on discharge.

**(2) Records from Savoy Medical Center dated June 22-25, 2007**. Claimant reported that she took 10 to 15 Lunesta following an argument on the telephone with her husband who

was offshore. (Tr. 433, 440). She was a recovering alcoholic. The impression was intentional drug overdose. (Tr. 434). She was transferred to New Horizons on day of discharge. (Tr. 436).

**(3) Records from New Horizon Psyche Hospital dated May 20, 2006 to November 3, 2008**. On October 1, 2007, claimant was admitted for alcohol detoxification for alcohol /drug abuse or dependence. (Tr. 314). She was driving while intoxicated, having an alcohol level reported as 146, and had taken at least two Fiorcets for headache. (Tr. 315). She ran off the road and hit a tree. She had multiple bruises, and was feeling quite bad, depressed, helpless and hopeless. She had approximately two months of sobriety prior to her starting drinking again a few weeks prior. She drank at least every other day and a minimum of a six pack.

After the time of discharge from the hospital, claimant was in good condition. The final diagnosis was alcohol dependency, chronic, continuous; major depressive episode, recurrent, moderate, no psychosis; alcohol withdrawal moderate, multiple bruises secondary to MVA, and GAF 60, highest 90. She was prescribed Campral, Cymbalta, Cyclobenzaprine, Ibuprofen, and Seroquel. (Tr. 316).

**(4) Records from Dr. Stephen Nason dated July 24, 2008 to November 14, 2008**. On July 24, 2008, claimant complained of back pain after a motor vehicle accident on October 1, 2007. (Tr. 514). She complained of some pain radiating into the buttock area.

On examination, claimant had some tenderness in the mid-line of the lumbar spine, particularly in the lower section, and acute tenderness over her right SI joint. She had a negative straight leg raising test and no neurological deficit.

X-rays showed an abnormality of the L5 vertebra with a tilt to the right side and a small compensatory scoliosis above that, and almost total loss of the disc space at L5-S1. Dr. Nason's

impression was compression fracture at L5 with degeneration of the L5-S1, and sacroiliitis.  (Tr. 513).

On August 18, 2008, claimant still had pain in the lower back and sacroiliac area.  (Tr. 512).  Dr. Nason gave her an injection in the S1 joint, and prescribed Ultracet for pain.

On October 31, 2008, claimant had increased back pain and a lot of migraine headaches.  (Tr. 511).  The injection had helped some.  She was doing her regular activities, but had trouble doing all of her housework.  Dr. Nason recommended an MRI.

An MRI of the lumbar spine dated November 5, 2008, showed evidence of degenerative disc disease and mild generalized bulging at L5-S1.  (Tr. 515).

**(5) Records from Dr. George Williams dated January 8, 2009 to October 1, 2009**.

On January 8, 2009, claimant complained of low back and right leg pain after a motor vehicle accident.  (Tr. 539).  She reported that she had had no treatment for this thus far.[1]  A lumbar MRI revealed degenerative disc and herniation at L5-S1.  (Tr. 542).  The impression was lumbar back pain, lumbar HNP and lumbar radiculopathy.

On September 10, 2009, claimant continued to complain of back and leg pain.  (Tr. 519).  A CT discogram was positive at L5-S1.  (Tr. 520, 533).  The assessment was lumbar back pain, lumbar degenerative disc, lumbar HNP and lumbar spondylosis.  (Tr. 520).

After conservative care consisting of physical therapy and injections failed, Dr. Williams recommended surgery.  (Tr. 544-555).  On October 5, 2009, Dr. Williams performed a decompression and fusion at L5-S1.  (Tr. 518, 523-27, 567-69).

---

[1] However, claimant had previously been treated by Dr. Nason.  (Tr. 510-15).

5

**(6) Psychological Evaluation by Sandra B. Durdin, Ph.D., dated January 12, 2010**.

Claimant complained of back, nerve, leg, joint, and sleeping problems, anxiety, lumbar degenerative disc disease, and manic depression. (Tr. 573). She reported that she had had two DUIs, the last one occurring two years prior. (Tr. 574). She saw Dr. Parks once a year and a counselor for mental health medications. Her medications included Acamprosate, Seroquel, Duloxetine, Olanzapine, and Escitalopram. Dr. Williams had prescribed Soma and Vicodin.

On examination, claimant was alert and oriented in all spheres. Her pace was normal, and attention and concentration were good. Affect and mood were normal. Memory and overall cognitive skills were within average limits. Her estimated level of intellectual functioning was average.

Thought content and organization were logical and goal-directed. She reported no perceptual distortions, suicidal ideations, or homicidal ideations. Insight and judgment were normal with sobriety. (Tr. 575).

Claimant had a long history of alcohol abuse and was still struggling with it. She might not have been attending regular meetings. She received medication from mental health once a month.

Dr. Durdin's diagnostic impression was alcohol dependence, chronic, in partial remission; partner relational problems, and depressive disorder, NOS. She opined that claimant's ability to understand, remember and carry out simple and detailed instructions was within average limits. Her ability to maintain attention to perform simple, repetitive tasks for two-hour blocks of time was good. Her ability to sustain effort and persist at a normal pace over the course of a 40-hour workweek was adequate from a mental perspective.

Claimant's ability to relate to others, including supervisors and co-workers, was good. Her ability to tolerate stress and pressure associated with day-to-day work activity and demands was adequate. She was capable of managing her personal financial affairs if sober.

Dr. Durdin noted that records indicted that claimant was drinking again last year and she reported a recent slip. She observed that claimant had been in multiple substance abuse programs, but seemed to think she had received most help from her last admit, Red River.

**(7) Psychiatric Review Technique ("PRT") by Jack Spurrier, Ed.D. dated September 27, 2010**. Dr. Spurrier assessed claimant under Listing 12.09 for substance addiction disorders and 12.04 for affective disorders and found that she did not meet a listing. (Tr. 64, 746).

**(8) Records from Savoy Medical Center dated January 22, 2010 to May 10, 2010**.

On May 10, 2010, claimant complained of an injury to her left foot after a motor vehicle accident. (Tr. 609). Left foot x-rays showed comminuted fractures through the distal ends of the third, fourth and fifth metatarsals with a questionable fracture through the distal end of the second metatarsal; comminuted fracture of the tarsal cuboid, and associated generalized soft tissue swelling. (Tr. 628). A CT of the right foot showed extensive fractures of the second, third and forth proximal metatarsal bones; second, third, fourth and fifth metatarsal bones; an apparent distal phalanx adjacent of the right fifth metatarsophalangeal joint, and extensive soft tissue swelling. (Tr. 662). Cervical spine views were normal. (Tr. 627).

**(9) Records from Orthopedic Surgeons dated May 11, 2010 to June 13, 2010**.

Claimant was admitted for open fractures of the left foot. (Tr. 655). Dr. Matthew Williams performed irrigation and debridement with excision of bony fragment and I&D of the

open fifth metatarsal of the left foot.

On May 25, 2010, Dr. Christopher Hebert performed an open reduction internal fixation of the left second, third and fourth metatarsal head and neck fractures, partial fifth ray resection, open reduction internal fixation of cuboid, and open reduction internal fixation of the navicular. (Tr. 668).

On June 7, 2010, Dr. Hebert reported that claimant's wounds had healed. (Tr. 679). There was no evidence of infection.

On June 8, 2010, Dr. William performed irrigation and debridement of left foot open fractures with involvement of the skin, soft tissue and bone. (Tr. 659).

**(10) Records from Ville Platte Mental Health Center dated September 27, 2008 to June 28, 2010**. On February 27, 2008, claimant complained of depression and mood changes. (Tr. 687). She began drinking after her divorce. She went into rehab, and had been sober for 90 days. The assessment was depression and anxiety despite sobriety. (Tr. 689).

On November 14, 2008, claimant was medication compliant, except that she refused to take Campral, saying she did not need it. (Tr. 733). She was encouraged to take her medications as ordered. She had not taken Campral in one month.

On December 23, 2009, claimant reported medication adherence without side effects. (Tr. 697). However, the examiner commented that compliance was questionable. She admitted to taking a drink after a year of sobriety and discussed not using this slip up to interfere with her progress.

On June 28, 2010, claimant did not attend substance abuse followup, and her Seroquel could not be refilled until July because she had been given a 90-day supply. (Tr. 740). Her other

medications included Campral, Lexapro, Zyprexa and Cymbalta.  (Tr. 686).

**(11) Consultative Examination by Dr. Durdin dated September 15, 2010**.  Claimant complained of a low back injury, shattered foot and manic depression.  (Tr. 740).  She looked tired and very medicated.  She reported that she had stopped going to Mental Health because "they gave too many medications."  (Tr. 741).  While she told Dr. Durdin that she saw Dr. Parks once a month for a year, records indicated that she was mostly seeing the nurse for medication pickup.  Her medications included Ranitidine, Seroquel, Oxycodone, Bupropion, Hydromorphone, Zyprexa, Lorazepam, Premarin and Wellbutrin.  (Tr. 741-42).

On examination, claimant was alert and oriented in all spheres.  Her pace, attention and concentration were normal.  (Tr. 742).  Despite looking like she was under the influence of substances, she was not inattentive or distracted.  She was tearful about her foot, marital separation, and her husband allegedly bothering her.

Claimant's memory and overall cognitive skills were intact.  She did not have problems with long-term information, immediate recall or short-term memory.  Her estimated level of intellectual functioning was average.

Thought content and organization were logical and goal-directed.  Claimant did not report any perceptual distortions, suicidal ideations or homicidal ideations.

Dr. Durdin's impression was polysubstance dependence, partner relational problems and depressive disorder, NOS.  She determined that claimant's ability to understand, remember and carry out simple instructions and familiar detailed instructions was not significantly impaired.  Her ability to maintain and attention to perform simple, repetitive tasks for two-hour blocks of time was not significantly impaired.  Her ability to sustain effort and persist at a normal pace

over the course of a 40-hour week was not significantly impairment from cognitive or acute emotional problems.

Additionally, Dr. Durdin noted that claimant was recovering from surgery, had reportedly quit mental health and was on a number of medications which might alter mental status. She had not gone to substance abuse counseling as recommended by Dr. Parks months prior.

Dr. Durdin stated that claimant's ability to relate to others, including supervisors and co-workers, was not significantly impaired. She also found that claimant's ability to tolerate the stress and pressure associated with day-to-day work activity and demands was mildly impaired. She was capable of managing her personal financial affairs.

**(12) Records from Alexandria Cardiology Clinic dated March 15, 2011 to May 17, 2011**. A myocardial rest and stress perfusion study showed no evidence of stress ischemia. (Tr. 756). Holter Monitor interpretation showed inappropriate sinus tachychardia and evidence of ST segment depression compatible with ischemia. (T. 754).

On May 17, 2011, claimant complained of retrosternal chest pain occurring at rest. (Tr. 748). Palpitations were described as constant tachycardic feeling occurring two to three times per day. She drank a pot of coffee and two to three caffeinated cokes per day, denied use of alcohol, and smoked one pack of cigarettes per day.

An echocardiogram showed 1+ MR, Trace – TR, P1 and EF – 64. (Tr. 751).

The impression was panic attacks, excessive caffeine intake, SVT, abnormal EKG and smoker. (Tr. 749).

**(13) Report from Dr. Stephen Wyble dated December 13, 2012**. Dr. Wyble reported that he had treated claimant since July, 2010, for a number of diagnoses, including

postlaminectomy syndrome of the lumbar spine, chronic pain syndrome, sacroiliitis and CRPS of her left leg. (Tr. 760). He stated that she had multiple procedures, including spine surgery, multiple injections and a spinal cord stimulator trial. He noted that even with all of these interventions, she still required pain medications to help control her pain.

Dr. Wyble stated that overall, claimant had improved significantly with all of these treatments, but still lived in a state of chronic pain. She was limited in ambulation secondary to her CRPS (chronic regional pain syndrome) in her left leg. He did not foresee where she could perform any significant work duties, with the possible exception of a sedentary position with frequent changes from sitting to standing. He stated that even given modified conditions for a sedentary position, claimant would still need and require oral narcotic pain medications to treat her condition. She had not reported significant changes in cognitive functions with these medications. He noted, however, that this would be a concern to any job position.

**(14) Administrative Hearing Testimony of Dr. Rick Adams, Medical Expert**. Dr. Adams testified that claimant did not appear to meet or equal a listing under the B or C criteria for the mental listings. (Tr. 33). Additionally, he stated that the drugs and alcohol were material and resulting in more extreme problems such as the accidents and the hospitalizations that she had required. He opined that from a psychiatric standpoint, she would be limited to simple, routine, repetitive tasks. (Tr. 33-34).

**(15) Claimant's Administrative Hearing Testimony**. At the hearing on February 20, 2013, claimant testified that she was 38 years old. (Tr. 36). She stated that she was 5 feet 11 inches tall and weighed about 150 pounds. She had a driver's license and was able to drive.

Claimant testified that she had completed the ninth grade, and quit in the tenth. (Tr. 36). She had last worked in 2003 as a housekeeper. (Tr. 36-37).

Regarding complaints, claimant reported that she had a limp, leg numbness and foot problems from a shattered leg and an amputated toe. (Tr. 37-39). She also complained of panic attacks and anxiety. (Tr. 40-41). She was taking medications, including Percocet 10, Oxycodone, Lyrica, anti-anxiety and anti-depressant drugs, which relieved her symptoms. (Tr. 37, 39). She reported no side effects. (Tr. 37). She was not receiving any mental health treatment. (Tr. 38).

Additionally, claimant reported that she had had problems with alcohol in the past, but now had that under control. (Tr. 41).

As to restrictions, claimant testified that she could walk for a couple of blocks, then had to stop and sit down. (Tr. 37). She said that it took her 20 minutes to walk a couple of blocks. She reported that she could stand for an hour before she started hurting.

Claimant stated that she could bend but not stoop. (Tr. 37-38). She could squat with pain. (Tr. 38). She reported that she could lift a 20-pound bag of potatoes. She had no limitations as to sitting.

Regarding activities, claimant testified that she could do housework, dust, wash dishes, sweep and mop with breaks, and shop. (Tr. 38, 41-42).

**(16) Administrative Hearing Testimony of Donald Rue, Vocational Expert ("VE")**.

Mr. Rue described claimant's past work as a nursing home housekeeper as medium with a Specific Vocational Preparation ("SVP") of 2. (Tr. 43). The ALJ posed a hypothetical in which he asked the VE to assume a claimant age 38 with nine years of education, who had the

12

exertional ability to perform light work with the following limitations: the ability to alternate walking and standing, walk for 20 minutes, stand for one hour with unlimited seating, and simple, routine, repetitive tasks.  In response, Mr. Rue stated that she could not return to her past work, but could work as a telephone solicitor, of which there were 177,636 positions nationally and 1,611 statewide; reception clerk, of which there were 121,649 positions nationally and 2,122 statewide, and price marker, of which there were 267,662 positions nationally and 3,323 statewide.  (Tr. 44).

The ALJ then changed the hypothetical to assume the restrictions in Dr. Wyble's report to a claimant who was limited to a sedentary position requiring frequent changes from sitting to standing; required oral narcotic pain medications to treat her condition; had daily panic attacks; was in chronic pain, and had certain limitations on her ambulatory ability.  (Tr. 44-45).  In response, Mr. Rue opined that from a strictly vocational standpoint, that would not preclude her from participate in the sedentary level positions.  (Tr. 45).

**(17) The ALJ's Findings**.  Claimant argues that: (1) the ALJ should have found disabled at step 3 of the sequential evaluation process, and (2)  the ALJ erred in relying on the vocational expert's testimony in finding that claimant was not disabled.

First, claimant argues that the ALJ should have found her disabled at step 3 of the sequential evaluation process.

Pursuant to the Social Security Act, the Commissioner promulgated regulations establishing a five-step sequential evaluation process for determining whether an individual is disabled.  *Ledet v. Comm'r of Soc. Sec. Admin*., 2014 WL 4976070, at *4 (W.D. La. Oct. 3, 2014) (*citing* 20 C.F.R. §§ 404.1520, 416.920).  At step one, an individual who is working and

engaging in substantial gainful activity will not be found disabled regardless of medical findings. At step two, an individual who does not have a severe impairment will not be found disabled.  At step three, an individual who meets or equals an impairment listed in the regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1 will be considered disabled without consideration of vocational factors.  If an individual is capable of performing the work he has done in the past, a finding of not disabled must be made at step four.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if the claimant can perform any other work at step five.  *See, e.g., Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991), summarizing 20 C.F.R. § 404.1520(b)-(f).

　　　　Here, the ALJ found at step 2 that claimant had the following severe impairments: status-post fracture of the left foot, degenerative disc disease status-post lumbar fusion, affective disorder, and history of substance abuse addiction disorder.  (Tr. 10).  At step three, he determined that claimant did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment under the Social Security listings.

　　　　Claimant argues that the ALJ should have found her disabled at step 3.  However, she did not indicate which listing applied.

　　　　The ALJ evaluated claimant under Sections 12.04 and 12.09 of the Social Security listings.  (Tr. 10-12);  20 CFR Pt. 404, Subpt. P, App. 1, §§ 12.04 and 12.09.  In finding that she did not meet these listings, he gave "some weight" to the opinion of the state agency psychological consultant, Dr. Spurrier, who opined that claimant's alleged mental impairments were not severe, causing no more than minimal limitations on claimant's ability to perform work-

related activities. (Tr. 10-11, 64). He gave "great weight" to Dr. Adams' opinion at the hearing that claimant's mental impairments did not meet or equal listing 12.04 or 12.09.[2] (Tr. 11, 32-33). Additionally, the ALJ cited Dr. Adams' testimony that claimant did not have marked limitations under the Part B criteria of the listings. (Tr. 11, 34). He also considered the paragraph C criteria, finding that the evidence did not support these criteria. (Tr. 12).

Paragraph B of section 12.04 for affective disorders requires that claimant's mental impairments result in at least two of the following: (1) marked restriction of activities of daily living; or (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace, or (4) repeated episodes of decompensation, each of extended duration.

Paragraph C of section 12.04 requires one of the following: (1) repeated episodes of decompensation, each of extended duration; or (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.04.

The ALJ determined that claimant had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration,

---

[2]12.09 regarding substance addiction disorders provides, in pertinent part: The required level of severity for these disorders is met when the requirements in any of the following are satisfied: A. Organic mental disorders. Evaluate under 12.02. B. Depressive syndrome. Evaluate under 12.04. C. Anxiety disorders. Evaluate under 12.06. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, §12.09.

persistence, or pace, and no episodes in decompensation. (Tr. 11-12). This finding is supported by Dr. Adams, who testified that claimant did not appear to meet or equal a listing under the B or C criteria for the mental listings, as well Dr. Durdin, who reported that claimant had normal pace, attention and concentration; had no significant impairment as to her ability to relate to others, and was only mildly impaired as to her ability to tolerate the stress and pressure associated with day-to-day work activity and demands. (Tr. 32-33; 742). As the ALJ's finding is supported by the evidence, it is entitled to deference.

  Additionally, the record reflects that the ALJ's findings are supported by claimant's own statements. As to activities of daily living, claimant indicated in her testimony, as well as in the Function Report – Adult, that she could care for her own personal needs and grooming and do chores, including doing laundry, dusting, washing dishes, sweeping, mopping and shopping. (Tr. 38, 224-26). She also testified that she had a driver's license and was able to drive, which contradicts her statement in her disability report that she did not drive. (Tr. 36, 226). It is appropriate to consider the claimant's daily activities when deciding the claimant's disability status. *Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995).

  Regarding social functioning, the ALJ cited claimant's Function Report, in which she indicated that she visited with friends over the phone and in person. (Tr. 11, 227). She also checked that she had no problems getting along with family, friends, neighbors or others. (Tr. 228). As this finding is supported by claimant's own statements, the ALJ's finding is entitled to deference.

  As to concentration, persistence and pace, claimant indicated in her Function Report that she was able to pay attention for a "long while," was able to finish what she started, and could

"often" follow instructions well. (Tr. 228). While she reported that she could not handle stress well and had panic attacks, she indicated at the hearing that her medications relieved her symptoms and caused no side effects. (Tr. 37, 39). If an impairment reasonably can be remedied or controlled by medication, treatment or therapy, it cannot serve as a basis for a finding of disability. *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987).

Further, claimant testified that she was not receiving any mental health treatment. (Tr. 38). It is well established that the ALJ is not precluded from relying upon the lack of treatment as an indication of nondisability. *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990); *Chester v. Callahan*, 193 F.3d 10, 12 (1st Cir. 1999) (gaps in the medical record regarding treatment can constitute "evidence" for purposes of the disability determination). Thus, the ALJ's finding as to credibility is entitled to great deference. *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000).

Regarding claimant's physical impairments, Dr. Wyble observed that claimant had "improved significantly" with treatment for her lumbar spine, including surgery, injections and a spinal cord stimulator. (Tr. 760). Additionally, Dr. Hebert reported that claimant's foot wounds had healed post-surgery without complications. (Tr. 679). As set forth above, if an impairment reasonably can be remedied or controlled by medication, treatment or therapy, it cannot serve as a basis for a finding of disability. *Johnson*, 864 F.2d at 348; *see also Harper v. Sullivan*, 887 F.2d 92, 97 (5th Cir.1989) (substantial evidence supported ALJ's finding that claimant's subjective symptomology not credible when no physician on record stated that claimant was physically disabled). Thus, this argument lacks merit.

Next, claimant argues that the ALJ erred in relying on the vocational expert's testimony in finding that she was not disabled. However, the record reflects that the ALJ incorporated claimant's limitations in formulating hypotheticals, including the ability to alternate walking and standing, walk for 20 minutes, stand for one hour with unlimited seating, and perform only simple, routine, repetitive tasks. (Tr. 43). It is well established that the ALJ is not bound by VE testimony which is based on evidentiary assumptions ultimately rejected by the ALJ. *See Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir. 1985). As the ALJ's hypothetical to the vocational expert reasonably incorporated all limitations of the claimant recognized by the ALJ, and the claimant or her representative had the opportunity to correct deficiencies in the ALJ's question, the ALJ's findings are entitled to deference. *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996)**.

Signed this 16th day of Septermber, 2015, at Lafayette, Louisiana.

_____
**CAROL B. WHITEHURST**
**UNITED STATES MAGISTRATE JUDGE**